**LONG BEACH FEDERAL SAVINGS AND LOAN ASSOCIATION, Petitioner,**

**v.**

**FEDERAL HOME LOAN BANK BOARD; Albert J. Robertson, Chairman; Ira A. Dixon, Member; William J. Hallanan, Member (or former member); John M. Wyman, Director and/or Chief Supervisor; A. V. Ammann, Assistant Director and/or Assistant Chief Supervisor; Federal Savings and Loan Insurance Corporation; William H. Husband, Manager of said Insurance Corporation, Respondents.**

**No. 1039–60–PH.**

United States District Court
S. D. California,
Central Division.
Nov. 18, 1960.

Charles K. Chapman, Long Beach, Cal., for petitioner.

Marvin C. Taylor, Attorney, Department of Justice, Washington, D. C., for respondents.

HALL, Chief Judge.

The within proceeding was commenced on September 9, 1960, with the filing of what is designated as "Petition To Enforce Administrative Subpoenas And For Other Relief."

It is difficult to state in summary form either the factual or the legal contentions and questions which must be resolved, but they will become apparent as this memorandum proceeds.

## I.

By F.R.Civ.P. 81(a)(3)[1] the Federal Rules of Civil Procedure apply to proceedings to compel the giving of testimony or the production of documents in accordance with a subpoena issued by an officer or an agency of the United States under any statute of the United States except as "otherwise provided" by statute or rules of the District Court, or by an order of the court in the proceedings.

The Administrative Procedure Act [5 U.S.C.A. § 1001 et seq.] and Section 503 (d)(1) of the Housing Act of 1954[2] [12 U.S.C.A. § 1464] permit the issuance of subpoenas by the Federal Home Loan Bank Board or its designated representatives.

The Housing Act of 1954 in Section 503 (d)(1) specifically provides for the enforcement of subpoenas by the United States District Court in the District where the hearing is designated—this court in this instance—which section reads, inter alia, as follows:

"The board or any member thereof or its designated representative shall have power to administer oaths and affirmations and shall have the power to issue subpenas (sic) and subpenas (sic) duces tecum, and shall issue such at the request of any interested party, and the board or any interested party may apply to the United States District Court where such hearing is designated for the enforcement of such subpoena or subpoena duces tecum and such court shall have power to order and require compliance therewith."

Section 6(c) of the Administrative Procedure Act provides as follows:

"(c) Subpenas (sic).—Agency subpenas (sic) authorized by law shall be issued to any party upon request and, as may be required by rules of procedure, upon a statement or showing of general relevance and reasonable scope of the evidence sought. Upon contest the court shall sustain such subpena (sic) or similar process or demand to the extent that it is found to be in accordance with law and, in any proceeding for enforcement, shall issue an order requiring the appearance of the witness or the production of the evidence or data within a reasonable time under penalty of punishment for contempt in case of contumacious failure to comply."

1. "These rules apply (1) to proceedings to compel the giving of testimony or production of documents in accordance with a subpoena issued by an officer or agency of the United States under any statute of the United States except as otherwise provided by statute or by rules of the district court or by order of the court in the proceedings, and (2) to appeals in such proceedings." 28 U.S.C.

2. Section 503 of the Housing Act of 1954 is codified as 12 U.S.C.A. § 1464. References hereafter in this Memorandum to that Section will be cited as Section 503 of the Housing Act of 1954.

That section must be read and applied in conjunction with the above-quoted provisions of Section 503 of the Housing Act of 1954. The sections are not in conflict, and if anything, Section 6(c) of the Administrative Procedure Act complements the provision of the Housing Act of 1954 in that it permits the production of documents or data without the necessity of having a witness present at all times while the documents or data are under examination.

Thus, there is no statute by which the *procedure* for enforcement of administrative subpoenas is "otherwise provided" than by Federal Rules of Civil Procedure as provided in F.R.Civ.P. 81(a)(3). There are no rules of this court, or order of this court in this proceeding "providing otherwise," and if there were, it is at least doubtful if either would prevail over the statutory command just above quoted.

The proceeding is and must be considered to be a proceeding on a motion under F.R.Civ.P. 7(b)(1) and (2), and the Federal Rules of Civil Procedure control it.

This proceeding to enforce subpoenas is completely independent of the proceedings before the Board or the Hearing Examiner.

The Ninth Circuit, in July of this year, in Flotill Products, Inc. v. Federal Trade Commission, 278 F.2d 850, had under consideration the enforcement of subpoenas under Section 9 of the Federal Trade Commission Act [15 U.S.C.A. § 49] which is substantially the same as the heretofore-quoted portion of Section 503 of the Housing Act of 1954. As to the nature of the proceeding in the District Court, that Court said, at page 852:

> "The proceeding in the district court was not ancillary to prior administrative action but formed an independent cause of action framed by the pleadings therein. I.C.C. v. Brimson (1894) 154 U.S. 447, 487 [14 S.Ct. 1125, 38 L.Ed. 1047]. Once the order of the trial court was entered, the hearing examiner's subpoena was superceded and became inoperative and irrelevant."

See also Hubner v. Tucker, 9 Cir., 1957, 245 F.2d 35.

The motion is therefore, the pleading taking the place of the complaint in an ordinary civil action. Parties may rely on affidavits—F.R.Civ.P. 6(d)—or on oral or documentary evidence adduced at the hearing, or both.

It is a summary proceeding.

Pursuant to the accepted practice, the Court issued an Order to Show Cause in lieu of a summons [see F.R.Civ.P. 4(e); 28 U.S.C. § 1651(b)] as to why the subpoenas should not be enforced. Service of the Order to Show Cause was made in accordance with the terms thereof and the Federal Rules of Civil Procedure, and was accepted by counsel for all of the above-named respondents.

The respondents filed what was designated as a "Motion To Dismiss," but which contained a prayer for affirmative relief, was verified generally by one of defendants' counsel, and had attached to it a transcript of the proceedings before the Hearing Officer, and an affidavit of the above-named Robertson and Dixon. The affidavit denied generally any bias or prejudice. Counsel for respondents, on the last day of the hearing, stated that 16 subpoenas should have been attached to the response, but the Court denied the motion to attach the subpoenas, and ordered the subpoenas filed merely as a part of the record.

The "Motion" of respondents was, therefore, more than a mere motion to dismiss. It was a legal and factual response, and in a summary proceeding of this nature must be considered as the answer of respondents raising, as it may, questions of law, F.R.Civ.P. 12(b).

Hearings were had on September 7, 12, 13, 14 and 15, 1960, devoted mostly to argument and the admission of documentary evidence.

The litigious history between the Long Beach Federal Savings and Loan Association and the Federal Home Loan Bank Board and its various members and offi-

cers, and agencies under its control, has been going for 14 years.[3]

In addition to many unreported memoranda, opinions, decisions and orders contained in the files and records, that litigation has been the subject of the following reported decisions: Mallonee v. Fahey, D.C.1946, 68 F.Supp. 418; Fahey v. Mallonee, 1947, 332 U.S. 245, 67 S.Ct. 1552, 91 L.Ed. 2030; Ex Parte Fahey, 1947, 332 U.S. 258, 67 S.Ct. 1558, 91 L.Ed. 2041; Mallonee v. Fahey, D.C.1949, 14 F.R.D. 273; Home Loan Bank Board v. Mallonee, 9 Cir., 1952, 196 F.2d 336, certiorari denied Mallonee v. Fahey, 345 U.S. 952, 73 S.Ct. 863, 97 L.Ed. 1374; Mallonee v. Fahey, 9 Cir., 1952, 200 F.2d 918; Fahey v. O'Melveny & Myers, 9 Cir., 1952, 200 F.2d 420, rehearing denied 12/17/52, certiorari denied Mallonee v. Fahey, 345 U.S. 952, 73 S.Ct. 863, 97 L.Ed. 1374, rehearing denied 345 U.S. 978, 73 S.Ct. 1120, 97 L.Ed. 1393; Fahey v. Calverley, 9 Cir., 1953, 208 F.2d 197, rehearing denied 12/29/53, certiorari denied Utley v. Fahey, 347 U.S. 955, 74 S.Ct. 681, 98 L.Ed. 1100; Mallonee v. Fahey, D.C. 1953, 117 F.Supp. 259; Federal Home Loan Bank of San Francisco v. Long Beach Federal Savings & Loan Ass'n, D.C.1954, 122 F.Supp. 401; Mallonee v. Fahey, D.C.1954, 122 F.Supp. 472;

---

**3.** A brief and summary statement touching on that history will be helpful:

The Association was subjected to a conservator proceeding in 1946, which was followed immediately by litigation in this court. The management and control of the Association was returned to it in 1948 after much litigation, under an order made by the Home Loan Bank Board and by this Court. The litigation commenced immediately after the appointment of the conservator in 1946, (A. V. Ammann, a respondent in the instant proceeding and presently an Assistant Director of Supervision for the Board, was the conservator and a defendant in the litigation). The litigation has proliferated ever since so that at one time there were 14 suits pending in this court prior to the two suits recently filed, to say nothing of the cross-claims, interpleaders, intervenors, and third-party claims. At one time more than 14 million dollars in cash, bonds and property were on deposit in this court, and a total of over one and one-half million dollars is still on deposit in this court and the State courts, in the various suits still pending, of which more than $300,000 are on deposit in one of two suits which were ordered dismissed on extra-ordinary writ proceedings by the Court of Appeals, but in which that court failed to advise this court how to dispose of the money then on deposit, which had been put into court by parties who had long since ceased to be parties to the litigation. And over $1,000,000 of that total is on deposit in the State courts, to which one of the suits was remanded and is still pending.

The Association was a party to all of said suits, as were some or all of the following named corporations and individuals: Home Loan Bank Board, Federal Savings and Loan Insurance Corporation, Federal Home Loan Bank of San Francisco, and some or all of the members or officers thereof, as well as said A. V. Ammann and other employees of said agencies, commonly referred to as a group throughout the past litigation as "Official Defendants."

The Court, as well as the Association, throughout all of the litigation, attempted to bring some or all of said various suits to trial on the merits, but the "Official Defendants" by special writ procedures and other delaying practices resisted these moves to go forward so that *nothing has ever been tried on the merits* either so far as the first seizure of the Association is concerned, or any of the suits and controversies growing out of it from and since then.

About two years ago it was represented to the court that good-faith efforts were being made by all parties to negotiate complete settlement of all controversies involved in all of said matters. Nothing to the contrary was ever stated or represented to this Court until April 26, 1960, when the Association filed suit No. 506–60 in this court, which disclosed that the Home Loan Bank Board, by its Order No. 13,372 dated April 19, 1960, had appointed one C. E. Ault as "Supervisory Representative in Charge," who took possession and control of said Association, its premises and assets, and ousted the managment thereof without any previous notice of any kind, on the evening of April 22, 1960.

In that case, No. 506–60, hearings were had in this court on May 9 and 23, August 3, 4, 9, 17, 18, 22, 24, 25, 26, 29 and 31, 1960.

Federal Home Loan Bank of San Francisco v. Long Beach Federal Savings & Loan Ass'n, D.C.1954, 122 F.Supp. 960; Federal Home Loan Bank of San Francisco v. Hall, 9 Cir., 1955, 225 F.2d 349, rehearing denied 10/12/55, certiorari denied Mallonee, Bucklin & Fergus v. Federal Home Loan Bank, 350 U.S. 968, 76 S.Ct. 438, 100 L.Ed. 840; Long Beach Federal Savings & Loan Ass'n v. Federal Home Loan Bank of San Francisco, 1955, 76 S.Ct. 32, 100 L.Ed. 1517; Ammann v. Home Investment Co., 9 Cir., 1957, 243 F.2d 748.

The seizure of the Association in 1946, mentioned in Footnote 3, and the ensuing litigation was the subject of hearings and an investigation by Special Sub-committee of Congress in 1950, 1951 and 1952, and finally resulted in the adoption and passage of the National Housing Act of 1954 on August 2, 1954.[4] That Act provides specific procedures—by Section 503 (d)(1)—in connection with the appointent of a conservator, and by Section 503 (d)(2) thereof permits the appointment of a Supervisory Representative in Charge by the Board without notice in case of an emergency if "a ground for the appointment of a conservator or receiver as herein provided exists."

4. The April 22, 1960, seizure was the subject of hearings by a Congressional Committee in June, 1960, the record of which covers over 1100 printed pages. A special report was issued on said hearings by the House Committee on Government Operation—dated July 2, 1960 [H.R. 2083, 86th Cong.2d Sess.]. Further Congressional Committee hearings were had on August 25, 26 and 29, 1960, and cover over 250 printed pages.

5. They are substantially the same as in Order No. 13,372. It would seem they would almost have to be, as such Agent cannot be appointed unless "a ground for the appointment of a conservator * * exists." 12 U.S.C.A. § 1464(d) (2).

6. Further hearings were had on September 7 and 8, 1960.

7. These tensions are understandable on the part of the Association and its officers when it is considered that at the time the Association was first seized in May of 1946, its deposits were 23 million dollars, which diminished during the

II.

The Board, on April 19, 1960, adopted its Order Number 13,372 (Appendix "A") appointing C. E. Ault, an employee of the Board (or one of its agencies), as Supervisory Representative in Charge, who took possession and control of the Association's premises, assets and property on the evening of April 22, 1960. The Association had no notice of either the Board's Order of April 19, 1960, or of the intention to execute it until it was executed on April 22, 1960.

Thereafter, the Board, by its Order Number 13,340 (Appendix "B") dated May 12, 1960, set June 27, 1960, at Los Angeles, as the time and place for the commencement of an administrative hearing on whether the grounds specified therein[5] exist for the appointment of a conservator. The date for commencement of the hearings was continued from time to time until September 1, 1960, when proceedings actually began before Honorable Robert N. Hislop as Hearing Examiner.[6]

The proceedings were at once charged with the tensions and anxieties which have permeated the entire litigation for the past 14 years.[7]

custody of the conservator Mr. Ammann to 13 million dollars at the time of the return to the Association of its management in 1948; and these deposits had grown to 95 million dollars at the time of the second seizure on April 22, 1960, but diminished by 60 million dollars to 35 million dollars in deposits on July 31, 1960, while in the custody of the Supervisory Agent in Charge who, during that time, had borrowed 45 million dollars from one of the government agencies. (The figures are in round numbers.)

They are also understandable when it is considered that the Board members and Mr. Ammann and others are defendants in suits wherein the Association or its shareholders seek recovery of large sums of money for alleged wrongful acts, and that the Supreme Court has said public officials may become tort-feasors by exceeding the limits of their authority—Land v. Dollar, 1947, 330 U.S. 731, 738, 67 S.Ct. 1009, 91 L.Ed. 1209—and also stated in litigation concerning the

The Association secured subpoenas and subpoenas duces tecum from the Hearing Officer for respondents and others, supporting the application therefor with verified charges of disqualification, bias, prejudice and interest on the part of the members of the Board who had, as such Board, adopted both Orders No. 13,372 and No. 13,440, and on the part of A. V. Ammann.

The Board moved before the Hearing Officer to quash the subpoenas and the subpoenas duces tecum to Board members Robertson and Dixon, and to Board employees Wyman and Ammann, theretofore issued by the Hearing Officer at the behest of the Association. The grounds asserted therein were four: (1) that the oral and documentary testimony sought by petitioner's subpoenas relating to the appointment of the Supervisory Representative in Charge under the Board's Order No. 13,372 was not within the jurisdiction of the Hearing Examiner as his appointment was limited to a hearing under the Board's Order No. 13,440; (2) that oral and documentary evidence sought by the subpoenas which might go to Petitioner's charge of bias, prejudice and disqualification of the Board is irrelevant and immaterial upon a hearing under the Board's Order No. 13,440; (3) that the subpoenas are burdensome, unreasonable and oppressive, and for that reason should be quashed; and (4) that no authority exists to require the four above-named persons who reside in Washington, D. C., which is out of this District and more than 100 miles from Los Angeles, to come to Los Angeles, and give testimony.

It must be observed that such grounds for quashing are urged only to the Hearing Examiner, *and were not stated in Respondents' response as grounds for the denial of Petitioner's Complaint to enforce the subpoenas.* They are before the Court only as an exhibit (No. 9) *offered by the Petitioner.* They will, however, be considered.

The verified application for the subpoenas filed by the Association, dated June 20, 1960, contained a "Statement or Showing of General Relevance and Reasonable Scope of the Evidence Sought," (Appendix "C"), [Administrative Procedure Act, Section 6(c), 5 U.S.C.A. § 1005(c)] which alleged that the Board and the members thereof were collectively and personally biased, prejudiced, interested and disqualified to consider, hear, or decide, either as hearing officers or otherwise, the issues of fact and law presented by the allegations and charges in both Order No. 13,372 and Order No. 13,440. In the Association's verified denial of accusations filed on September 1, 1960, before the Hearing Officer, three separate affirmative defenses were set out, *enlarging the charges of bias and prejudice.* [For text see Appendix "D"].

It should be mentioned that the only denial of the charges by any of the parties who were subpoenaed was the affidavit of Board Members Robertson and Dixon attached to Respondents' response in the within proceedings, which denial is in general terms. [For text see Appendix "E"].

The Association filed with the Hearing Examiner a response to the Motion to Quash, asserting, among other things, that the question of disqualification, bias, prejudice and personal interest must be heard and decided first before any hearing could proceed on the merits either as to Order No. 13,372 or Order No. 13,440, and that if Petitioner participated in the hearing without such procedure, the Association would be held to waive its point.

The witnesses did not and have not responded to the subpoenas.

The Hearing Examiner did not make any written order. He did make several statements from which it appears that he

first seizure in 1946, in 'Fahey v. Mallonee, 1947, 332 U.S. 245, at page 256, 67 S.Ct. 1552, at page 1557, 91 L.Ed. 2030: "Nor do we mean to be under-

stood that if supervising authorities maliciously, wantonly and without cause destroy the credit of a financial institution, there are not remedies."

had decided he would not hear any testimony of "motivation" (presumably bias, prejudice, interest or other grounds of disqualification) of the Board or its members, and would not hear any evidence relating to the Board Order of April 19, 1960 (No. 13,372), appointing the Supervisory Representative in Charge. But this proceeding is not to review the rulings of the Hearing Examiner on the admissibility of evidence—it is a proceeding to enforce subpoenas, i. e., to compel certain specified persons to be present, with documents, and to testify when called. And the long and the short of it is that those persons were not present when the subpoenas required them to be, nor were the documents produced; and the Hearing Examiner did not, by his statements or otherwise, make any definitive indication that he would require the subpoenas to be honored, but left Petitioners, at best, in a position of present non-compliance and uncertainty as to future compliance.

In that state of the record, the Petitioners were and are entitled to have recourse to this court for enforcement of the subpoenas under the provisions of Section 503 of the Housing Act of 1954, unless there are other reasons why the subpoenas should not presently be enforced.

### III.

■ Among other things, Petitioner contends that neither the Hearing Officer nor the Board has the power to revoke or quash subpoenas.

It is right in this contention.

Congress could have granted such power to Hearing Officers appointed under the Administrative Procedure Act, or to the Board or Hearing Officers in the Housing Act of 1954, as Congress did to the National Labor Relations Board by 29 U.S.C.A. § 161(1),[8] but Congress did not do so in the Housing Act of 1954, but limited the power of the Board to the *issuance* of such subpoenas.

The Housing Act of 1954, Section 503. (d)(1) provides, as heretofore quoted:

"The Board or any member thereof or its designated representative shall have power to administer oaths. and affirmations and shall have power to issue subpoenas and subpoenas. duces tecum, and *shall issue* such at. the request of any interested party, and the Board or any interested. party may apply to the United States. district court of the district where. such hearing is designated for the enforcement of such subpoena or subpoena duces tecum, *and such courts shall have the power to order and require compliance therewith.*" (Emphasis added.)

It is a matter of mere logic that the power to order and require "compliance" carries with it the power to withhold. compliance, i. e., to revoke or quash or modify.

Nor does the Administrative Procedure Act grant any such power. Section 7(b) of that Act [5 U.S.C.A. § 1006(b)] limits. the powers of Hearing Officers to nine things, none of which include the power to revoke or quash subpoenas. And Section 6(c) of the Administrative Procedure Act [5 U.S.C.A. § 1005(c)] provides. that "upon contest," i. e., motion to enforce or quash, "the Court" shall have the power to enforce or withhold enforcement of such subpoenas. While Cudahy Packing Co. v. Holland, 1942, 315 U.S. 357, 62 S.Ct. 651, 86 L.Ed. 895, dealt with the power of an administrator to delegate his subpoena power to another, the con-

---

8. The cases relied upon by Respondents to support the power of the Hearing Examiner to quash subpoenas are not in point as they all arose under the National Labor Relations Act which by Section 11 [29 U.S.C.A. § 161(1)] the National Labor Relations Board is specifically given power to "revoke" subpoenas on application and hearing. The cases referred to are: N. L. R. B. v. International Typographical Union, D.C., 76 F.Supp. 895; N. L. R. B. v. Lewis, 9 Cir., 249 F.2d 832; and N. L. R. B. v. Duval Jewelry Co., 357 U.S. 1, 78 S.Ct. 1024, 2 L.Ed.2d 1097. 29 U.S.C.A. § 161 (1) reads in part: "Such person may petition the Board to revoke, and the Board shall revoke, such subpoena * * *" if certain conditions do or do. not exist.

tent of the decision supports the principle that subpoena powers, whether to issue or quash, should not be upheld unless the power is expressly granted in the Statute.

If a witness does not appear in response to a subpoena and testify, the means to compel compliance or withhold it, under both Section 6 of the Administrative Procedure Act and Section 503 (d) (1) of the Housing Act of 1954, is by seeking the power of the District Court in the District of the hearing, by a proceeding filed under the Federal Rules of Civil Procedure which are made applicable to such proceedings by Rule 81(a) (3). And the fundamental elements of due process require that the party who does not respond either to the subpoena, or who appears and refuses to testify, shall be made a party to such proceeding and given an opportunity to be heard.

The power to enforce is the power to impose sanctions, i. e., punishment for disobedience; or to withhold sanctions, i. e., to quash. Both of these are judicial powers and neither is committed to the Board or a Hearing Officer under either the Administrative Procedure Act or the Housing Act of 1954.

█ I hold that neither the Board nor the Hearing Officer has the right or power to revoke or quash any of the subpoenas issued, and that the power to enforce or withhold enforcement, i. e., to quash, lies only in the United States District Court in which the hearing is held, upon an application therefor filed as a separate proceeding or proceedings in such District Court, naming as respondents the person or persons against whom enforcement is sought; or, if a motion to quash, naming as respondents the party who, or which, secured the subpoenas; and that any such proceedings are subject to the Federal Rules of Civil Procedure, and that the respondents are entitled, not only under the Rules, but as a fundamental element of due process, to be served and to be heard in the District Court.

Such motions to enforce or quash should be timely filed. They are in no sense review proceedings to await the final order of the agency. And the court may issue its order independent of and different in character from the administrative subpoena. Flotill Products, Inc. v. F. T. C., supra.

Thus the *procedure* followed by the Petitioner, while summary in nature, in seeking enforcement of the subpoenas before this Court, is the proper procedure. It was filed as a separate civil proceeding; it named the parties upon whom the process of the court is sought to be invoked; and service was made in accordance with the order and the Federal Rules of Civil Procedure, and accepted by counsel who have appeared and represented the respondents; and they have had their opportunity to be heard.

IV.

█ But the "shot gun" request of Respondents contained in the prayer of their "Motion To Dismiss" that "this court rule * * * that all witnesses duly subpoenaed to give testimony and produce documents before the examiner * * * shall do so * * *," is not in compliance with any provision of any law. No notice was given to, or service of any order or process was had upon, any of the 16 persons or entities named in the subpoenas. Should this Court grant such motion, it would be violating the most fundamental concepts of due process which have been expounded at length by the Supreme Court in cases too numerous to mention or here repeat. Thus there is no proceeding properly before this court to enforce—or to quash for that matter—the 16 subpoenas which were issued by the Hearing Examiner, and filed with this Court on September 15, 1960, the last day of the hearing in the within matter, and which named the following persons or entitles: Leon Frazer, Roy H. Wolfers, Louis D. Brunt, Thomas A. Gregory, Pacific Insurance Agency of Long Beach, Bernice M. Powers, First Escrow & Title Company, Title Service Company, Charles K. Chapman, A. G. Maspero, Mason E. Kight, Wm. H. Campbell, Lewis E. Williams, Earle W.

Sundall, Farmers & Merchants Trust Company of Long Beach, and E. V. Van Dusen.

The above-mentioned "prayer" of Respondents is denied.

**V.**

■ The subpoenas on Robertson, Dixon, Hallahan, Wyman, Ammann, and Husband were each served in Washington, D. C., and were accompanied with a check for $500 for the payment of mileage to Los Angeles.

One of the grounds of Respondents in opposition to enforcement of the subpoenas is that by F.R.Civ.P. 45(e) a court has no jurisdiction to enforce subpoenas served outside the District unless it is within 100 miles of the place of holding court. This argument overlooks the last clause of the above Rule which provides: "When a statute of the United States provides therefor, the court, upon proper application and cause shown may authorize the service of a subpoena at any other place."

Section 818 of the Housing Act of 1954, 12 U.S.C.A. § 1703 note provides:

"Insofar as the provisions of any other law are inconsistent with the provisions of this Act, the provisions of this Act shall be controlling."

Thus any inconsistency in F.R.Civ.P. 45(e) must yield to the direct provisions of Section 503 of the Housing Act of 1954 heretofore quoted.

The Housing Act of 1954, Section 503 (d) (1), specifically provides that the administrative hearing shall be in the Federal Judicial District of the association, and that the Board or any member or any designated representative (the Hearing Officer) "shall have the power to issue subpoenas and subpoenas duces tecum, and shall issue such at the request of any interested party." This section further provides that the District Court of such District *"shall have power to order and require compliance"* with such subpoenas. This is clearly a grant of original power and jurisdiction to the Board to issue, and to this Court to enforce, the above-mentioned subpoenas by requiring said persons to appear and attend at the hearing in Los Angeles, and is clearly within the exception contained in the last clause of F.R.Civ.P. 45(e).

The whole tenor of the Housing Act of 1954 is to relieve associations, their officers, employees and attorneys from the harassment and burden of traveling from distant points to Washington to give, or to get, testimony which may be given only by officials or employees of the government, or which may repose in government files. [See House Hearings on Housing Act of 1954].

I therefore hold that this Court has the power to compel the attendance of, and the production of documents and the giving of testimony by, the named Respondent witnesses at a hearing under the Housing Act of 1954 called in Los Angeles, in response to said subpoenas and subpoenas duces tecum, and in doing so, to use all of the means provided by the law to enforce compliance with its order.

**VI.**

■ While the Respondents did not raise the point in their "Motion" which I have held to be an answering response, their Motion to Quash the subpoenas addressed to the Hearing Examiner did claim the subpoenas should be quashed because they called for oral and documentary testimony relating to the appointment by the Board of "C. E. Ault as Supervisory Representative in Charge" to "take care of" the Association under Board Order No. 13,372 (Appendix "A"), and that the Hearing Examiner's appointment by Board Order No. 13,512 [9] is "limited to a hearing un-

9. "Federal Home Loan Bank Board. No. 13,512. Date: June 3, 1960. Resolved, That Robert Hislop, an examiner on the staff of the Securities and Exchange Commission, appointed as provided in the Administrative Procedure Act and

selected as provided in Section 11 of said Act [5 U.S.C. 1010], is hereby designated, pursuant to Section 509.5 of the General Regulations of the Federal Home Loan Bank Board, as trial examiner to conduct the hearing provided

der Resolution No. 13,440 (Appendix "B") to determine whether the 17 specific grounds therein stated exist for the appointment of a conservator of said Association." As heretofore mentioned, many of the things charged in Order No. 13,372 appointing the Supervisory Agent, and in Order No. 13,440 are the same, or substantially so.

It is to be noted that before the Board can appoint a Supervisory Representative in Charge, it must find two things to be true: *First*, that "a ground for the appointment of a conservator or receiver as herein provided exists;" and *second*, that an emergency exists. They did appoint the Supervisory Representative in Charge; he did take possession of all the Association's assets, property, records and premises on April 22, 1960; he is still in possession thereof; he has "all the powers herein provided for conservators * * *;" and "unless sooner removed," he may stay in possession of the assets, property, records and premises "until a conservator or receiver, appointed by the Board after notice as herein provided, takes charge of the Association and its affairs, or for six months, or until 30 days after the termination of the Administrative hearing and final proceedings herein provided, or until 60 days after the final termination of any litigation affecting such temporary appointment." Inasmuch as the Supervisory Representative has been in charge and possession of the property and records of the Association since April 22, 1960, and inasmuch as he has all of the records and property in his possession, it seems to me that it is inescapable that the Hearing Examiner must take testimony and evidence under Order No. 13,440 which goes to the question as to whether or not grounds existed, as set forth in Order No. 13,372, for the appointment of a conservator on April 19, 1960, the date of that Order. While the Supervisory Representative has been in charge and possession of the Association, deposits of the Association were withdrawn in the sum of approximately 60 million dollars between April 22, 1960, when its deposits were approximately 95 million dollars, and July 31, 1960, when its deposits had dropped to approximately 35 million. To limit the hearing to whether or not grounds "currently" exist for the appointment of a conservator would make a dead letter of the provisions of Section 503(d) (1) of the Housing Act of 1954 relating to the appointment of a conservator, and would press dangerously close to a denial of due process. April 22, 1960 was the last date the Association had possession and control of their property and records, and the last it or its management can be held responsible for any of the things charged in either Order No. 13,-372 or Order No. 13,440. Neither it nor its officers can be held responsible for what the Supervisory Representative in Charge, acting under the control of the accusing Board during that period, has done since.

In Beacon Federal Savings & Loan Ass'n v. Federal Home Loan Bank Board, D.C.Wis.1958, 162 F.Supp. 350, a Supervisory Representative in Charge had been appointed, followed by administrative hearings, the appointment of a conservator and a court review. That Court stated, at page 353:

"Any question as to the correctness of the Board's opinion, at the time when it summarily appointed a Supervisory Representative in Charge, that ground for the appointment of a conservator or receiver existed *and that an emergency existed* which required immediate action, *is merged* in the issue before

for by Federal Home Loan Bank Board Resolution No. 13,440, dated May 12, 1960, in the matter of Long Beach Federal Savings and Loan Association, Long Beach, California, or by said resolution as hereafter amended or supplemented; and Resolved Further, That the said

Robert Hislop is hereby designated as representative of the Federal Home Loan Bank Board to issue subpenas and subpenas (sic) duces tecum in connection with said hearing. By the Federal Home Loan Bank Board, (Signed) Harry W. Caulsen, Secretary."

the court on review of the administrative action. Fahey v. Mallonee, 1947, 332 U.S. 245, 253–254, 67 S.Ct. 1552, 91 L.Ed. 2030; Beacon Federal Sav. & Loan Ass'n v. Federal Home Loan Bank Board, D.C.E.D.Wis. 1956, 143 F.Supp. 534–536." (Emphasis added.)

The Court then went on to review the evidence which antedated the appointment of the Supervisory Representative in Charge, and held that the Board's findings of fact were "clearly supported by the weight of the evidence." This case was affirmed on a procedural matter by the Seventh Circuit in 266 F.2d 246, certiorari denied 361 U.S. 823, 80 S.Ct. 70, 4 L.Ed.2d 67, but the Circuit Court took occasion to approve the opinion of the District Court.

To hold that only the current condition of the affairs of the Association can be inquired into under Order No. 13,440 without examining whether grounds existed for the appointment of a conservator on April 19, 1960, would be similar to executing a judgment on the filing of a complaint, and then limiting the trial to whether or not the defendant had any property at the time of trial. It is like trying to "unring a bell."[10] The illustration may seem harsh, but it is apposite, and illustrates the unsoundness of Respondents' objection above-mentioned, not only as being contrary to the Act, but fraught, as well, with violation of due process.

I hold that evidence concerning whether or not grounds existed for the appointment of a conservator at the time of the adoption of Board Order No. 13,372 is proper and required in a hearing conducted under Board Order No. 13,440.

While it has been held that anticipatory judicial intervention with the Board's action in appointing a Supervisory Representative in Charge is improper, in Greater Delaware Valley Federal Savings & Loan Ass'n v. Federal Home Loan Bank Board, 3 Cir., 1958, 262 F.2d 371 [cited with approval in Beacon Federal Savings & Loan Ass'n v. Federal Home Loan Bank Board, 7 Cir., 266 F.2d 246, supra], it is also held in that case that Section 503(d) of the Housing Act of 1954 expressly provides for judicial review after culmination of the administrative hearings, thus indicating that the question of whether or not there was an emergency should be the subject of evidence before the Hearing Examiner, and review by the Court.

### VII.

■■■■■ Another ground urged before the Hearing Examiner, but not included in the response of Respondents before this Court, is that the duces tecum subpoenas are too general and are unreasonable and burdensome and oppressive in that they call for documents, et cetera, as far back as 1952, and thus should not be enforced. No showing was made either before the Hearing Examiner or before this Court as to the extent of the documents and things called for by the subpoenas duces tecum, whether it is merely a brief case full or a filing cabinet full. The mere assertion that compliance with a subpoena is burdensome and onerous is alone not sufficient without showing of the manner and extent of the burden and the injurious consequences of compliance. Moreover, both Order No. 13,372 and Order No. 13,440 contain charges of conduct of the Association going back as far as 1947. (See Appendices "A" and "B".) In light of this fact and the holdings of the Supreme Court in the following cases, I hold that the subpoenas are not too general and are not oppressive or burdensome or unreasonable. Oklahoma Press Pub. Co. v.

10. In National Labor Relations Board v. Duval Jewelry Co. et al., 1958, 357 U.S. 1, at page 9, 78 S.Ct. 1024, at page 1029, 2 L.Ed.2d 1097, Justice Whittaker in speaking of an oppressive subpoena said: "It is obvious that, after the illegal or oppressive subpoena has been enforced, the Board on its review of the completed record can no more relieve the consummated oppression than it can unring a bell." The same can be said of an illegal or oppressive seizure—or a legal one for that matter.

Walling, 1945, 327 U.S. 186, 66 S.Ct. 494, 90 L.Ed. 614; Wheeler v. United States, 1913, 226 U.S. 478, 33 S.Ct. 158, 57 L.Ed. 309; Consolidated Rendering Co. v. State of Vermont, 1908, 207 U.S. 541, 28 S.Ct. 178, 52 L.Ed. 327; Brown v. United States, 1928, 276 U.S. 134, 48 S.Ct. 288, 72 L.Ed. 500; and Consolidated Mines of California v. Securities and Exchange Commission, 9 Cir., 1938, 97 F.2d 704.

## VIII.

■ Before considering the objection of Respondents that the Hearing Examiner has no power to take evidence of bias and prejudice of the Board under the Order appointing him, and other questions, I will turn to the procedural question involved in the filing of the amendment to Petitioner's petition proffered on September 15, 1960, the last day of the hearing, and Respondents' objection thereto. By that proposed amendment, Petitioner asserts that the Hearing Examiner is "disqualified" for failure of the Board to comply with the terms of the Administrative Procedure Act in the selection and appointment of the Hearing Examiner.

The position taken in the proposed amendment raises a question not theretofore raised as to the legality of the appointment of the Hearing Examiner, as throughout the three days of hearings before the Hearing Examiner (during which no evidence was taken), it was the position of Petitioner that it was not contending that the Hearing Examiner was personally biased, prejudiced or disquali-fied, but that the Order appointing him was void (Order No. 13,372) as well as all orders of the Board relating to the appointment of the Supervisory Agent in Charge, and the hearing on conservatorship, for the reason that the *Board and its members* were disqualified because of bias, prejudice and personal interest in the outcome of the hearings. That was the position of Petitioner's counsel at the hearing before this Court until September 13, 1960, when counsel for Respondents produced, under Court order, copies of the correspondence leading up to the orders of the Board appointing the Hearing Officer, whereupon Petitioner promptly, at the next session of the court, presented the proposed amendment raising the new question that the Hearing Examiner was not properly selected.

Petitioner contends, among other things, that the filing of the proposed Amended Petition was timely, and that it has the right to file the amendment under F.R.Civ.P. 15(b).

In that connection, it is necessary to briefly review the evidence of the history of the appointment of the Hearing Examiner, and the time when Petitioner had knowledge of the antecedent actions of the Board member Robertson and the General Counsel for the Board.

On June 15, 1960, there was mailed (Exhibit 10) by regular mail to Petitioner's counsel, a copy of Board Resolution No. 13,512 dated June 3, 1960. (See Footnote 9). The hearing was then set to begin in Los Angeles on June 27, 1960. A copy of Board Resolution No. 13,511 [11]

11. "Federal Home Loan Bank Board. No. 13,511. Dated June 3, 1960. Resolved: That, pursuant to the authority vested in it by law, including Section 7 of the Act of May 21, 1920, 41 Stat. 601, 617, as amended by Section 601 of the Act of June 30, 1932, 47 Stat. 382, 417, and as later amended (31 U.S.C. 686), and pursuant to Section 11 of the Administrative Procedure Act (5 U.S.C. 1010), the Federal Home Loan Bank Board hereby determines to utilize, as trial examiner to conduct the hearing provided for by Federal Home Loan Bank Board Resolution No. 13,440, dated May 12, 1960, in the matter of Long Beach Federal Savings and Loan Association, Long Beach, California, or by said resolution as hereafter amended or supplemented, the services of Robert Hislop, an examiner on the staff of the Securities and Exchange Commission, appointed as provided in the Administrative Procedure Act and selected as provided in Section 11 of that Act, accepts the offer of the Securities Exchange Commission to detail the said Robert Hislop to the Federal Home Loan Bank Board on a reimbursable basis, and authorizes the General Counsel, the

dated June 3, 1960, was first produced by Respondents' counsel on September 13, 1960, in court. All parties waived foundation of the various exhibits. Later on the same day, Exhibits 11–A, 11–B, 11–C, 11–D, 11–E, 11–F, 11–G, 11–H, 11–I and 11–J were produced by Respondents' counsel and admitted into evidence.

From these exhibits it appears by a letter dated May 24, 1960, from Mr. Robertson, Board Chairman, to the Chairman of the Securities Exchange Commission, that they had previously had a conversation wherein the loan of a hearing examiner was requested from the Securities Exchange Commission, and as the letter stated: "It is our understanding that Robert Hislop * * * can be made available to conduct this hearing." This was followed by a letter dated May 27, 1960, from the Securities Exchange Commission to Mr. Robertson, Board Chairman, confirming the fact that Mr. Hislop would be made available. There then followed a letter dated June 1, 1960, to the United States Civil Service Commission, by the General Counsel of the Board, stating that negotiations for a hearing examiner had been conducted with the Securities Exchange Commission, and that the Commission has "agreed to make available to the Board Mr. Hislop on a reimbursable basis," and that "it would be appreciated if you will give your approval for Mr. Hislop to act for the period not to exceed September 1, 1960." This was in turn followed by a letter dated June 2, 1960 from the Civil Service Commission to the General Coun-

Secretary, and the Director of Personnel severally to take or cause to be taken such action and execute such writings as may be necessary or appropriate to effect the acceptance of said offer and the effectuating of the provisions of this resolution, and hereby ratifies and confirms any and all action heretofore taken by any of them in the premises; and the Board hereby determines it to be in the interest of the Government to utilize the services aforesaid as hereinbefore provided. By the Federal Home Loan Bank Board. (Signed) Harry W. Caulsen, Secretary."

sel of the Federal Home Loan Bank Board confirming that Mr. Hislop would be assigned. Subsequently, by letter dated July 25, 1960, from the Securities and Exchange Commission, the loan of Mr. Hislop was confirmed to be agreeable for hearings to commence on September 1, 1960, and by letters of July 29, August 9, August 11 and August 19, 1960, the period of Mr. Hislop's service as Hearing Examiner for the Board was extended to November 30, 1960.

It must be added that Part I of the printed transcript (1110 pages) of the Congressional Committee hearings of June and July, 1960, are in evidence as Exhibit 12, and that the General Counsel of the Board, on June 21, 1960 (page 599), in response to a question by Congressman Holifield: "And you selected Mr. Hislop?" testified: "I selected him because he was in the Securities Exchange Commission, and I understood that he was an outstanding examiner." While Petitioner contends that this testimony conflicts with the letters of Exhibit 11 series, it is mentioned because Respondents contend that Petitioner, by that testimony, had notice on June 21, 1960, that Mr. Hislop was not selected by the Civil Service Commission,[12] and any objection to his qualifications on that ground has been waived as not timely.

In view of the fact that Petitioner did not have knowledge of the correspondence in the Exhibit 11 series, or of the facts disclosed therein until September 13, 1960, and had only a copy of Board Order No. 13,512 appointing the Hearing Examiner, I hold that F.R.Civ.P. 15(b)

12. It is implicit in that contention that the hearing examiner *was* selected by the General Counsel of the Board, and was *not* selected by the Civil Service Commission, and was *not* selected by the *Board.* The Administrative Procedure Act, its history, hearings thereon, and reports to Congress are searched in vain for any provision that would authorize an attorney for an agency to select the hearing examiner before whom he would present his case.

is applicable to these proceedings, and that by filing the amendment to the Complaint, based on such correspondence, on September 15, 1960, the next court day, Petitioner acted promptly, and had not waived its right to object to the method of selection of the Hearing Examiner, and the proposed amendment was timely if the amendment was otherwise proper.

The Petitioner makes two contentions on the merits in connection with proposed amendment to the complaint, viz.: (a) that under Section 11[13] of the Administrative Procedure Act, agencies not having hearing examiners (it is conceded that the Board is such an agency) may only use hearing examiners "selected" by the Civil Service Commission, and that the hearing examiner in this instance was selected by the Board or one of its members, and hence is not a qualified hearing examiner under Sections 5, 7 and 8 of the Administrative Procedure Act; (b) that the provisions of 5 C.F.R. 34.14(b)[14] of the Rules and Regulations of the Civil Service Commission, which Respondents claim validates the appointment of the hearing examiner, is void as being contrary to the express terms of Section 11 of the Administrative Procedure Act and its whole intent and purpose to prevent administrative officers and agencies from being both the accuser and the judge, or selecting one of their choice to make the decision in a proceeding where the agency is the accuser,[15] and that this court in this proceeding has the power to declare such rule of the Civil Service Commission void,

and the hearing examiner unlawfully "selected."

In view of the conclusions which will shortly appear, this court will not reach those questions in this proceeding.

## IX.

Before considering any other contentions of the parties, I will examine the general principles pertaining to bias, prejudice, interest, and other grounds of disqualification of judicial and quasi-judicial officers and agencies.

Proceedings of the kind instituted here are often described as quasi-judicial proceedings. Morgan v. United States, 1936, 298 U.S. 468–480, 56 S.Ct. 906, 80 L.Ed. 1288.

And in considering the question of disqualification of administrative officers and agencies, and hearing examiners, the Courts have analogized them to judges, when a charge of disqualification—for whatever ground—is made. This principle is probably best stated in National Labor Relations Board v. Phelps, 5 Cir., 1943, 136 F.2d 562, at pages 563–564, where the Court stated: "A fair trial by an unbiased and non-partisan trier of the facts is of the essence of the adjudicatory process as well when the judging is done in an administrative proceeding by an administrative functionary as when it is done in a court by a judge. *Indeed, if there is any difference, the rigidity of the requirement that the trier be impartial and unconcerned in the result applies more strictly to an administrative adjudication where many of the safe-*

13. Section 11, Administrative Procedure Act: " * * * Agencies occasionally or temporarily insufficiently staffed may utilize examiners selected by the Commission from and with the consent of other agencies. For the purposes of this section, the Commission is authorized to make investigations, require reports by agencies, issue reports, including an annual report to the Congress, promulgate rules, appoint such advisory committees as may be deemed necessary, recommend legislation, subpoena witnesses or records, and pay witness fees as established for United States courts."

14. The text of that Rule is: "Agencies, by agreement between themselves, may arrange for the temporary utilization by one agency of a hearing examiner or hearing examiners of another agency. Such agreements must have the prior approval of the Commission before being put into effect."

15. See Senate Report 752, 79th Cong. 1st Sess., and House Report 1980, 79th Cong.2d Sess.

*guards which have been thrown around court proceedings have, in the interest of expedition and a supposed administrative efficiency been relaxed. Nor will the fact that an examination of the record shows that there was evidence which would support the judgment, at all save a trial from the charge of unfairness, for when the fault of bias and prejudice in a judge first rears its ugly head, its effect remains throughout the whole proceeding. Once partiality appears, and particularly when, though challenged, it is unrelieved against, it taints and vitiates all of the proceedings, and no judgment based upon them may stand."* (Emphasis added.)

In Berkshire Knitting Mills v. N. L. R. B., 3 Cir., 1941, 121 F.2d 235, at pages 238–239, the court held that it was essential that the resolution of contested questions be made by an impartial and disinterested tribunal, and said: "Certain rules, of more or less definiteness, have been worked out through judicial decision by judges to regulate their own conduct. The rules disqualifying a judge for bias are illustrations. Other rules have been provided by legislatures to secure fairness in the trier of the facts. Thus prospective jurors may be examined for views which indicate predilections for either party to the controversy. * * * Litigants are entitled to an impartial tribunal whether it consists of one man or twenty and there is no way which we know of whereby the influence of one upon the others can be quantitatively measured."

In Inland Steel Co. v. N. L. R. B., 7 Cir., 1940, 109 F.2d 9, at page 20, it is stated: "The Act authorizes the Board to enter an order upon a complaint alleging unfair labor practices, only after a 'hearing.' This must mean a trial by a tribunal free from bias and prejudice and imbued with the desire to accord to the parties equal consideration. There is perhaps no more important right to which litigants are entitled than that they be given such a trial. Its impair-

ment, ipso facto, brings the court, and administrative bodies as well, into public disrepute, and destroys the esteem and confidence which they have enjoyed so generally. Time and experience have demonstrated that the public, as well as litigants, will tolerate the honest mistakes of those who pass judgment, but not the biased acts of those who would deprive litigants of a fair and impartial trial. *Foremost among the responsibilities imposed upon a reviewing court, is to make sure that this foundation of our Judicial system be not undermined."* (Emphasis added.) The Court then went on to quote and cite with approval the leading case of Judicial disqualification—Tumey v. State of Ohio, 1927, 273 U.S. 510, 47 S.Ct. 437, 71 L.Ed. 749—and the much cited case of Ohio Bell Telephone Co. v. Public Utilities Commission of Ohio, 1936, 301 U.S. 292, 57 S.Ct. 724, 81 L.Ed. 1093, which in turn, cited with approval the concurring opinion of Justice Brandeis in St. Joseph Stock Yards Co. v. United States, 1936, 298 U.S. 38, 56 S.Ct. 720, 735, 80 L.Ed. 1033, where Justice Brandeis stated that one of the "inexorable" safeguards which the due process clause assures is that the "trier of the facts shall be an impartial tribunal." In that case the trier of facts was the Secretary of Agriculture, an administrative officer in the Executive Department.

In United States v. L. A. Tucker Truck Lines, Inc., 1952, 344 U.S. 33, at page 38, 73 S.Ct. 67, at page 69, 97 L.Ed. 54, the Court, while holding that the objections to the qualifications of the hearing examiner came too late, nevertheless said: " * * * The defect in the examiner's appointment was an irregularity which would invalidate a resulting order if the Commission had overruled an appropriate objection made during the hearings."

A three-judge court in Riss & Co. v. United States and Interstate Commerce Commission,[16] D.C.W.D.Mo.1950, 96 F. Supp. 452, had under consideration a re-

---

16. A suit by the same Company decided by the United States Court of Appeals of the District of Columbia (1950) 86 U.S.App.D.C. 79, 179 F.2d 810, will be commented on later in this Memorandum.

view of the denial of plaintiff's application for a certificate of convenience and necessity. Plaintiff contended that no hearing had been had as required by Sections 5, 7 and 8 of the Administrative Procedure Act, in that the hearing examiner was not appointed in accordance with Section 11 of the Administrative Procedure Act. The three-judge court held the Administrative Procedure Act inapplicable, but the Supreme Court reversed without opinion (341 U.S. 907, 71 S.Ct. 620, 95 L.Ed. 1345) on the authority of Wong Yang Sung v. McGrath, 1949, 339 U.S. 33, 70 S.Ct. 445, 94 L.Ed. 616, which held that a denial of a hearing was lack of constitutional due process. Hence, the reversal of Riss on authority of Wong Yang Sung was a holding that due process was denied to Riss by a hearing before a hearing examiner not selected in compliance with Section 11 of the Administrative Procedure Act.

In Reliance Steel Products Co. v. United States et al., 1957, 150 F.Supp. 118, 123, the District Court for the Western District of Pennsylvania granted an injunction against an order of the Interstate Commerce Commission on the ground that the hearing examiner had not been appointed in accordance with Section 11 of the Administrative Procedure Act, and said, concerning the Riss case, supra: "The case of Riss & Co. v. United States * * * is significant * * *. Constitutional considerations rather than a statute required a hearing in that case. The hearing was conducted by a non-hearing examiner who admitted in evidence all testimony that the plain-

tiff offered on the decisive issue, and denied the application for a certificate of authority, in which the Commission concurred. The facts as alleged by the plaintiff were for the purposes of the decision admitted. There was no issue of admissibility of evidence or credibility of witnesses involved, and the plaintiff admitted that the hearing was fair and the examiner competent. Yet the decision was reversed (Riss & Co. v. United States, 341 U.S. 907, 71 S.Ct. 620, 95 L. Ed. 1345) on the authority of Wong Yang Sung v. McGrath, 339 U.S. 33, 70 S. Ct. 445, 94 L.Ed. 616, because the hearing [examiner] was not qualified as prescribed by the Administrative Procedure Act. See also: United States v. L. A. Tucker Truck Lines, 344 U.S. 33, 73 S.Ct. 67, 97 L.Ed. 54."

I agree with the foregoing statement that the reversal of the Riss case, supra, by the Supreme Court on the authority Wong Yang Sung v. McGrath, supra, was a holding that a hearing by a disqualified hearing examiner not appointed under the terms of the Administrative Procedure Act is a denial of constitutional due process.

▇▇▇ From the foregoing cases it is seen that the same standards concerning bias, prejudice, interest and disqualification must be applied to hearing examiners and members of administrative boards when acting in a "quasi-judicial" capacity, as are applied to judges.

In the Federal system, Sections 144 and 455 of Title 28 United States Code,[17] deal with the matter of disqualifications

17. "§ 144. Bias or prejudice of judge. Whenever a party to any proceeding in a district court makes and files a timely and sufficient affidavit that the judge before whom the matter is pending has a personal bias or prejudice either against him or in favor of any adverse party, such judge shall proceed no further therein, but another judge shall be assigned to hear such proceeding.

"The affidavit shall state the facts and the reasons for the belief that bias or prejudice exists, and shall be filed not less than ten days before the beginning of the term at which the proceeding is to be heard, or good cause shall be shown for failure to file it within such time. A party may file only one such affidavit in any case. It shall be accompanied by a certificate of counsel of record stating that it is made in good faith."

"§ 455. Interest of justice or judge. Any justice or judge of the United States shall disqualify himself in any case in which he has a substantial interest, has been of counsel, is or has been a material witness, or is so related to or connected with any party or his attorney as to render it improper, in his opinion, for him to sit on the trial, appeal, or other proceeding therein."

of Federal Judges and the time and manner of raising and deciding it.

The courts, in construing these sections, have imposed rigid requirements on judges.

Illustrative thereof is the Ninth Circuit case of In re Honolulu Consol. Oil Co., 1917, 243 F. 348, 352, where that Company sought and secured a *writ of mandamus* compelling Judge Bledsoe of this court to disqualify himself because of a possible stockholder's liability, not then asserted or alleged to be threatened or impending, on account of his former ownership of stock of the value of $16.90 in a corporation, not a party to the case, but a party to another case wherein the United States was seeking relief on the same general grounds as the Honolulu case. The court adopted the doctrine followed in California as announced in North Bloomfield Gold Min. Co. v. Keyser, 58 Cal. 315, where the City of Marysville brought a suit against the Gold Mining Company to restrain it from allowing its detritus from mining operations to be deposited on lands in the City of Marysville. The court held that because Judge Keyser owned a lot in Yuba City, across the Feather River from Marysville and not in the city limits of Marysville, he was "interested" under Section 170, California C.C.P., in the outcome of the litigation because the same thing might happen to Yuba City. The Ninth Circuit quoted with approval from that case, in part, as follows: "It is an ancient maxim, and one founded in the most obvious principles of natural right, that no man ought to be a judge in his own cause. That principle finds expression in our statute in these words: 'No justice, judge, or justice of the peace shall sit or act in any action or proceeding: 1. To which he is a party, or in which he is interested.' Section 170 Code of Civil Procedure. This provision should not receive a technical or strict construction, but one that is broad and liberal. 'The court ought not to be astute to discover,' said the Supreme Court of Michigan in Stockwell v. Township Board of White Lake, 22 Mich. 350, 'refined and subtle distinctions to save a case from the operation of the maxim, when the principle it embodies bespeaks the propriety of its application. The immediate rights of litigants are not the only objects of the rule. A sound public policy, which is interested in preserving every tribunal appointed by law from discredit, imperiously demands its observance.' "

While Tumey v. State of Ohio, 1927, 273 U.S. 510, 47 S.Ct. 437, 441, 71 L.Ed. 749, dealt with a State Judge, it is still the leading case dealing with the disqualification of judicial and quasi-judicial officers, and its principles have been applied to administrative agencies.[18] In it, Chief Judge Taft said: "That Officers acting in a judicial or quasi judicial capacity are disqualified by their interest in the controversy to be decided is of course the general rule * * *. No matter what the evidence was against him, he had the right to have an impartial judge. *He seasonably raised the objection, and was entitled to halt the trial because of the disqualification of the judge, * * * because of his direct pecuniary interest in the outcome, and because of his official motive to convict.*" (Emphasis added.)

■ It may be said from a distillation of the doctrine of the foregoing cases and many others dealing with the subject, that the right to an impartial judge or quasi-judicial officer, free from bias, prejudice, interest or other ground of disqualification, is a fundamental right, protected by the due-process clause of the Fifth Amendment, and thus a constitutional right which is, however, subject to waiver if not timely and sufficiently raised.

■ Under Sections 144 and 455 of Title 28 United States Code, and the cases construing those sections, the allegations contained in an affidavit must be accepted as true, and the judge has the right and the duty to determine whether

18. Inland Steel Co. v. N. L. R. B., 7 Cir., 1940, 109 F.2d 9, at page 20.

or not, on their face, they are legally sufficient to constitute a disqualification. If so, he must recuse himself. Mitchell v. United States, 10 Cir., 1942, 126 F.2d 560, certiorari denied 316 U.S. 702, 62 S. Ct. 1307, 86 L.Ed. 1771, rehearing denied 324 U.S. 887, 65 S.Ct. 855, 89 L.Ed. 1436; and cases cited following 28 U.S. C.A. §§ 144 and 455. An appeal from the order made by the Judge has sometimes been held to be appealable—Minnesota & Ontario Paper Co. v. Molyneaux, 8 Cir., 1934, 70 F.2d 545; In re Lisman, 2 Cir., 1937, 89 F.2d 898—and may also be reviewed by mandamus or prohibition. In re Lisman, supra; In re Honolulu Consol. Oil Co., supra. But whether by one method or the other, the asserted disqualification of a judge may be reviewed before a trial of the case is had on the merits.

With the foregoing in mind, I will turn to the Administrative Procedure Act and the Housing Act of 1954, and examine such provisions as may exist concerning the subject.

### X.

 The Housing Act of 1954 is silent on the subject of disqualification of hearing officers and board members, and the procedure to be followed. But the Administrative Procedure Act is not, either as to the method and time of raising, or the time of hearing such charges. Section 7(a) (3) of the Administrative Procedure Act provides, in its pertinent part, as follows: "The functions *of all presiding officers and officers participating in decisions in conformity with Section 8 shall be conducted in an impartial manner. Any such officer* may at any time withdraw if he deems himself disqualified, and *upon filing* in good faith of a timely and sufficient affidavit of personal [interest] or disqualification of *any such officer*, the agency shall determine the matter as a part of the record and decision in the case." (Emphasis added.)

In keeping with the Ninth Circuit case of Honolulu Consolidated Oil Co., supra, "This provision should not receive a technical or strict construction, but rather one that is broad and liberal. 'The court

(Agency) ought not to be astute to discover', * * * refined and subtle distinctions to save a case from the operation of the maxim (statute), when the principle it embodies bespeaks the propriety of its application."

The hearing officer appointed by the Board is clearly a "presiding officer," under the above quoted section. And the Board members are not only "officers participating in such decisions" which must be made under Section 8 of the Administrative Procedure Act, after hearing by a hearing officer, but the above section [Section 7(a) (3)] specifically requires that the "agency," i. e., the Board, must make the decisions as to all matters covered by the above section. Thus, the above section applies to both the charges of disqualification of the hearing officer and also to the charges of bias, prejudice and interest made against the Board.

And what is said, and the conclusions reached in this section of this Memorandum, apply to the charge of disqualification against the hearing officer and the charges of bias, prejudice, interest and disqualification of the members of the Board.

 The words "upon," "timely," "sufficient," and "good faith," as used in Section 7(a) (3) of the Administrative Procedure Act, are words in common use in the law, and must take their meanings from general law and adjudicated cases inasmuch as no definitions thereof are made in the Administrative Procedure Act, and inasmuch as no period of time before or after any given event is fixed for the filing, or hearing, or review of charges of bias, prejudice, interest, or disqualification, in either the Administrative Procedure Act or the Housing Act of 1954.

"Timely" means at the first reasonable opportunity after discovery of the facts tending to show disqualification, Chafin v. United States, 4 Cir., 1925, 5 F.2d 592, in time to avoid useless costs, Bishop v. United States, 8 Cir., 1926, 16 F.2d 410. It can mean after commencement of trial or other proceeding when facts upon which the affidavit is based were not

known prior thereto. Hurd v. Letts, 1945, 80 U.S.App.D.C. 233, 152 F.2d 121.

"Sufficient" means allegations of fact as distinguished from conclusions. And the facts must be such that, taken to be true as stated, they would be sufficient to convince an unbiased, unprejudiced, and disinterested mind. Foster v. Medina, 2 Cir., 1948, 170 F.2d 632; Fieldcrest Dairies v. City of Chicago, D.C.Ill. 1939, 27 F.Supp. 258. It may be considered sufficient, if made on information and belief—Berger v. United States, 1921, 255 U.S. 22, 41 S.Ct. 230, 65 L.Ed. 481—and the affidavit must be viewed in light of the whole situation. United States v. Murphy, D.C.Mo.1937, 19 F. Supp. 987.

"The word 'upon', as a preposition indicating when something happens or is to be done, means, according to Webster, 'with little or no interval thereafter.'" Kirk v. United States, 9 Cir., 1950, 185 F.2d 185, at page 188. It means "at the time of" the happening of an event, as, when something is required to be done "upon" the death of a person, it means as soon after the moment of death as preparations and arrangements can reasonably be made. See 43 Words and Phrases 429 et seq. and Pocket Part.

"Good faith" is of such common use in the law that citations would be superfluous. It means just what it says. It is the opposite of bad faith. It means with good intentions, and that a person advocating a thing in good faith has an abiding and honest belief that the facts advanced are true, and that the legal position taken is sound in law.

 If a timely and sufficient affidavit is not filed with the Board, grounds of disqualification are waived under the general rule that disqualification, if not timely raised, is waived. United States v. L. A. Tucker Truck Lines, 1952, 344 U.S. 33, 73 S.Ct. 67, 97 L.Ed. 54; Adams v. Witmer, 9 Cir., 1958, 271 F.2d 29; Gilligan, Will & Co. v. S. E. C., 2 Cir., 1959, 267 F.2d 461, certiorari denied 361 U.S. 896, 80 S.Ct 200, 4 L.Ed.2d 152; Marquette Cement Mfg. Co. v. F. T. C., 7 Cir., 1945, 147 F.2d 589; N. L. R. B. v. Baldwin Locomotive Works, 3 Cir., 1942, 128 F.2d 39.

 It follows that before the reviewing court has the jurisdiction to hear and determine the merits of any charges of bias, prejudice, interest or disqualification, a timely and sufficient affidavit to that effect must be filed with the agency, i. e., the Board.

 *Upon* the filing of such affidavit, that is, before taking any proceedings on the merits of the matter pending before the agency (Board)—in this case, the question of whether or not a conservator should be appointed—the Board must determine whether or not the affidavits are timely and sufficient, and made in good faith, and in doing so, they must accept the facts therein stated to be true.

If the Board affirmatively so finds, then the Board must, either by itself or by one of its members or a hearing examiner designated for that purpose,[19] proceed to hear the evidence that may be proffered on the merits in support of such charges, and make a determination thereon.

 In view of the holdings of the cases cited in Section IX hereof to the effect that a hearing or trial conducted by a biased, prejudiced, interested, and disqualified tribunal or officer is a denial of constitutional due process, and nullifies such proceedings, and that the requirements for an unbiased and disinterested tribunal apply more strictly to an administrative adjudication than to a judicial one,[20] it is clear to me, and I so hold, that the procedure outlined above is a preliminary prerequisite to the right

19. It is clear that Board Order No. 13,-512 (Footnote 9), appointing the Examiner, is not broad enough to empower him to hear, or recommend a decision, either on the timeliness, sufficiency, good faith, or merits of either the charges against him or the members of the Board.

20. Attention is called to the strict provisions of Section 5(c) of the Administrative Procedure Act concerning "separation of functions" of presiding officers.

of the Board to hear the charges contained in either or both Board Orders No. 13,372 and No. 13,440, and that such procedure must be followed whether the disqualification is urged against the Hearing Examiner or the Board members, or both.

It is further clear that this court does not have jurisdiction to determine the timeliness, sufficiency, or good faith of the charges, or their merits, *until* there has been an administrative adjudication by the Board on such matters. Mallonee v. Fahey, 332 U.S. 245, 67 S.Ct. 1552, 91 L.Ed. 2030; Home Loan Bank Board v. Mallonee, 9 Cir., 196 F.2d 336. Whether or not a reviewing court would have jurisdiction after such administrative determination prior to the time to review the final Board "decision in the case" is not now necessary to decide.[21]

## XI.

It affirmatively appears by notice filed in the within case that promptly after filing the Amended Complaint in the within proceeding, Petitioner asserted the disqualification of the Hearing Examiner by filing charges with the Board.

Thus the Board has, and since June 20, 1960, has had before it charges of bias, prejudice, interest and disqualification on the part of the members thereof, and since at least September 20, 1960, has had before it charges of disqualification of the Hearing Examiner on the ground that he was not appointed under the terms of Section 11 of the Administrative Procedure Act. Neither of these charges has been passed upon by the Board, either as to their timeliness, sufficiency, or good faith, or on the merits.

 The Hearing Examiner issued the subpoenas here sought to be enforced. If he is disqualified, his act in issuing those subpoenas is void, and the subpoenas would be of no force and effect.

 The Board issued the Orders for the appointment of the Hearing Examiner, and for the hearing to be held, and the charges against Petitioner. If the Board Members are disqualified because of bias, prejudice, interest, or other ground of disqualification, then their acts would be void, and so would the above-mentioned orders made by the Board.

 From the preceding discussion, it is apparent:

(1) That the proffered Amendment to the Petition offered by Petitioner on September 13, 1960, is premature in that the administrative process hereinabove outlined has not been had by the Board, and the Motion to file the Amendment to the Petition is denied. If the Board makes the decision required of it under the Administrative Procedure Act, it may hold that the Hearing Examiner was not appointed as required by Section 11 of the Administrative Procedure Act. Then, the matters raised by said Amendment would be moot;

(2) The petitioner having charged bias, prejudice, interest and disqualification on the part of the Board members, and disqualification on the part of the Hearing Examiner; and the Board, being under a duty to pass on the timeliness, sufficiency, good faith and, if these are affirmatively found, the merits of the

---

21. It may be regarded as doubtful if those cases foreclose inquiry, as plaintiffs therein sought relief on the ground of bias, et cetera, without a prior administrative determination on that question. And the Court of Appeals of the District of Columbia (1950) 86 U.S.App. D.C. 79, 179 F.2d 810, in deciding Riss & Co. v. United States and Interstate Commerce Commission, did not regard the disqualification of the hearing examiner as a constitutional question which, it was later held to be in those same proceedings by the Supreme Court (341 U.S. 907, 71 S.Ct. 620, 95 L.Ed. 1345) when it reversed a three-judge court of the Western District of Missouri, without opinion, on the authority of Wong Yang Sung v. McGrath, 339 U.S. 33, 70 S.Ct. 445, 94 L.Ed. 616. None of the above cases, and none cited by counsel which I can see, have considered the provisions of Section 10(c) of the Administrative Procedure Act, which permits "final" agency action to be reviewed when there is no other "adequate remedy in any court." I indicate no opinion thereon.

charges; and the Board not having yet done so, an order of this court directing the enforcement of the subpoenas at this time would be premature inasmuch as it is conceivable that there may be a new Hearing Examiner, or the Board may make orders disqualifying themselves, or both.

■ But to make such an order without staying the hearing on Board Orders No. 13,352 and No. 13,440 would, in view of the failure of the Board to act on the charges since June, 1960, and the apparent determination to proceed with the hearings notwithstanding the provisions of the Administrative Procedure Act herein referred to requiring the Board to pass on the questions involving bias, prejudice, interest, et cetera, would amount to a denial on the merits of the Association's Petition for enforcement of the subpoenas. Which brings up the question as to the power of this Court to stay the proceedings until the Board concludes the procedure hereinabove outlined as required by the Administrative Procedure Act concerning the charges of disqualification of the Hearing Examiner and of the Board members.

Before examining the cases, it is well to have recourse to the statutory power of this court in relation to the issuance of writs of various nature. It is found in 28 U.S.C. § 1651 which reads as follows: "The Supreme Court and *all courts established by Act of Congress* may issue *all* writs necessary or appropriate in aid of their respective jurisdictions." (Emphasis added.)

This Court is a court established by an Act of Congress, 28 U.S.C. §§ 84 and 132 to 144, inclusive. It is the court having jurisdiction of any review of the proceedings concerning the appointment of a conservator for the Long Beach Federal Building and Loan Association. The National Housing Act of 1954—Section 503—gives jurisdiction to the Fed-

eral District Court in the District where the home office of the Association is involved. The Home Office of the Association is in this District. This Court, therefore, has jurisdiction under the above statute, in aid of its jurisdiction to enforce or withhold enforcement of said subpoenas, and to issue the necessary process to stay the proceedings pending before the Board until compliance is had with the Administrative Procedure Act by the Board as hereinbefore outlined,[22] unless there is controlling case law to the contrary, or provisions in the Administrative Procedure Act to the contrary.

The Administrative Procedure Act, in Section 10(d), provides: "Interim Relief.— * * * Upon such conditions as may be required and to the extent necessary to prevent irreparable injury, every reviewing court * * * is authorized to issue all necessary and appropriate process to postpone the effective date of any agency action or to preserve status or rights pending conclusion of the review proceedings." As to this provision, the Senate Committee report said, among other things—[Rep. 752, 79th Cong. 1st Sess.]: "While it would not permit a court to grant a judicial license, *it provides intermediate judicial relief for every other situation* in order to make judicial review effective. The authority granted is equitable and should be used by both agencies and Courts to prevent irreparable injury or afford parties an adequate judicial remedy." (Emphasis added.) Thus, there is jurisdiction in this court, granted by the Administrative Procedure Act, to grant such a stay if there is irreparable injury.

Irreparable injury to the Association is apparent here if the Board proceeds, as it has done and as it threatens to do, on the merits of Orders No. 13,352 or No. 13,440, without the determination of the questions involved concerning the charges of disqualification of the Hearing Ex-

22. Whether this Court has the power to issue its writ of mandamus to compel the Board to comply with the procedure outlined above, and to make a decision thereon in the event it refuses to act on the charges of disqualification of the Hearing Examiner, or the charges of bias, prejudice, interest, and disqualification of the Board, is not necessary to decide at this time.

aminer and the Board members, in view of the testimony before the Congressional Committee by one of the Board members that it would be from 90 days to three years before an administrative adjudication could be had. In the meanwhile, staggering costs would be incurred by the Association, which would all be useless and wasted if, after final adjudication, it was held that either the Hearing Examiner or the Board members were disqualified on any grounds whatsoever. As seen from the cases cited, if that were the fact, the entire proceedings would be invalidated and the Association would be up against a second hearing where certainly the costs and time involved would be no less. Moreover, the Association is out of possession and control of its premises, property and business, and will be until such hearings, and rehearings, if any, are completed. That would certainly constitute irreparable injury. The loss of the use of 95 million dollars for the period of time involved, by a Building and Loan Association, would appear, by the mere statement, to be an irreparable injury.

The Respondents insist that controlling case law prevents this Court from issuing any stay. They rely principally upon Mallonee v. Fahey, 332 U.S. 245, 67 S.Ct. 1552, 91 L.Ed. 2030; Home Loan Bank Board v. Mallonee, 9 Cir., 196 F. 2d 336, 354, 380; Federal Home Loan Bank of San Francisco v. Hall, 9 Cir., 225 F.2d 349; and Riss & Co., Inc. v. United States and Interstate Commerce Commission, 1950, 86 U.S.App.D.C. 79, 179 F.2d 810. The first three cases above mentioned arose in this court. They are all to be distinguished from the case at bar in that the Petitioner herein sought, in those proceedings, to have the court invalidate the appointment of a conservator prior to recourse to, and exhaustion of, administrative remedies. Here, the Petitioner seeks and has sought a hearing and determination by the Board of Petitioner's charges of disqualification against the Board members and the Hearing Examiner, as required by Section 7(a) (3) of the Administra-

tive Procedure Act heretofore discussed at length. Petitioner seeks, not avoidance of, but compliance with, the terms of the Administrative Procedure Act. The situation is comparable to one arising before the Interstate Commerce Commission where the Kansas City & Southern Railway sought, in a valuation hearing, to offer certain testimony, which the Commission refused. The railroad sought a writ of mandamus from the District Court, but that court dismissed, which dismissal was affirmed by the Appellate Court. But, the Supreme Court reversed—United States ex rel. Kansas City Southern Railway Co. v. Interstate Commerce Commission, 1920, 252 U.S. 178, at page 187, 40 S.Ct. 187, at page 189, 64 L.Ed. 517—saying: "It is obvious * * * that we are required to decide, not a controversy growing out of duty performed under the statute, but one solely involving an alleged refusal to discharge duties which the statute exacts. Admonishing, as this does, that the issue before us is confined to a consideration of the face of the statute and the nonaction of the Commission in a matter purely ministerial, it serves also to furnish a ready solution of the question to be decided, since it brings out in bold contrast the direct and express command of the statute to the Commission to act concerning the subject in hand, and the Commission's unequivocal refusal to obey such command."

The Riss case [179 F.2d 810], abovementioned and relied on by Respondents, is to be distinguished in that, there, the agency *had acted* on the charges of disqualification, whereas here, the Board has not acted. Moreover, in none of the cases cited as being relied on in that opinion was there present the situation which is present here, i. e., charges of disqualification and failure by the administrative agency to act. In Macauley v. Waterman S. S. Corp., 1946, 327 U.S. 540, 66 S.Ct. 712, 90 L.Ed. 839, the dismissal of the complaint was upheld on the ground that Waterman, contending the matter was governed by the Internal Revenue Code, 26 U.S.C.A., was subject

to, and had failed to exhaust administrative remedies of, the Renegotiation Act, 50 U.S.C.A.Appendix, § 1191, under authority of Myers v. Bethlehem Shipbuilding Corp., 303 U.S. 41, 58 S.Ct. 459, 82 L.Ed. 638, in which Bethlehem sought to enjoin hearings by the National Labor Relations Board on the ground that the business was not covered by the National Labor Relations Act, 29 U.S.C.A. § 151 et seq. No such question is present here. In Federal Power Commission v. Arkansas Power & Light Co., 1947, 330 U.S. 802, 67 S.Ct. 963, 91 L.Ed. 1261, there was also no question of due process or disqualification, or time for hearing charges, present, but the question was whether the Federal Power Commission had regulatory power over the Company's records or the State of Arkansas. The Supreme Court simply held that the Federal Power Act, 16 U.S.C.A. § 825l controlled, and that the Power Company had to exhaust its administrative remedies under that Act. No such question is present here. Securities and Exchange Commission v. Otis & Co., 1949, 338 U.S. 843, 70 S.Ct. 89, 94 L.Ed. 516, originated in the District Court of the District of Columbia [Otis & Co. v. National Ass'n of Securities Dealers, 84 F.Supp. 395]. Otis sought to prevent its divulgence of certain information to an industry committee on the ground it was confidential. The Securities Exchange Act, 15 U.S.C.A. § 78a et seq. provided that the action of the committee was subject to review by the Securities and Exchange Commission, which had not been sought or had. The District Court dismissed on the ground that no showing was made which would take the case out of the rule requiring exhaustion of administrative remedies as stated in Myers v. Bethlehem Shipbuilding Corp., 303 U.S. 41, 58 S.Ct. 459, 82 L.Ed. 638. The Circuit Court reversed the District Court [85 U.S.App.D.C. 122, 176 F.2d 34], and was in turn reversed by the Supreme Court. Here again, it was simply a question of whether or not Otis was covered by the Act, and no question of due process or of disqualification. The District Court

pointed out in the Otis case—84 F.Supp. 398: "Furthermore, * * * no final action adverse to the plaintiffs can be effective until they have had an opportunity to apply to a Court of Appeals for a stay of such action." No such situation exists here, for action adverse to Petitioner has already been taken by seizure of its property, assets, premises and business. The other case relied on in the Riss case, decided by the Court of Appeals of the District of Columbia [86 U.S.App.D.C. 79, 179 F.2d 810], was United States v. Los Angeles & Salt Lake R. Co., 273 U.S. 299, 47 S.Ct. 413, 414, 71 L.Ed. 651, from which the District of Columbia Appellate Court quoted with approval, as follows: "The so-called order here complained of is one which does not command the carrier to do, or to refrain from doing, anything; which does not grant or withhold any authority, privilege, or license; which does not extend or abridge any power or facility; which does not subject the carrier to any liability, civil or criminal; which does not change the carrier's future status or condition; which does not determine any right or obligation." Those things cannot be said of the situation of the Association at the present time in the instant case, out of possession and control of its property since April 22, 1960.

Examination of the other cases relied on by Respondents shows them to be equally distinguishable on the facts.

I fail to be convinced that controlling case law prevents this court from staying the proceedings now pending before the Hearing Examiner until the Board has determined the timeliness, sufficiency, and good faith of the charges against both the Hearing Examiner. and the Board members; and if either or both are decided affirmatively as to those matters, until hearing on the merits by the Board, or a member thereof, or a Hearing Examiner designated for that purpose, and a decision by the Board thereon.

The within will serve as Findings of Fact and Conclusions of Law under the

provisions of Federal Rules of Civil Procedure

Accordingly, it is hereby

Ordered, Adjudged and Decreed that:

1. The Motion of Petitioner to file the Amendment to Petition, made on September 13, 1960, is denied;

2. The "Motion" of Respondents that "all witnesses duly subpoenaed to give testimony and produce documents before the examiner * * * shall do so" is denied as to the following persons and entities, viz.: Leon Frazer, Roy H. Wolfers, Louis D. Brunt, Thomas A. Gregory, Pacific Insurance Agency of Long Beach, Bernice M. Powers, First Escrow & Title Company, Title Service Company, Charles K. Chapman, A. G. Maspero, Mason E. Kight, Wm. H. Campbell, Lewis E. Williams, Earle W. Sundall, Farmers & Merchants Trust Company of Long Beach, and E. V. Van Dusen, without prejudice to a proper motion for enforcement in a proper proceeding with proper service on the parties named in subpoenas;

3. The Order heretofore made submitting the matter on the merits of Petitioner's Petition for the enforcement of subpoenas issued to Respondents by the Hearing Examiner, Hon. Robert Hislop, is hereby vacated, and further proceedings on said Petition are stayed in this Court until the further order of this Court;

4. The above-named Respondents, and each of them, and the attorneys, agents, servants and employees of them, or any of them, and the said Hon. Robert Hislop, are, and each of them is, hereby restrained and enjoined from proceeding with any hearing under Board Order No. 13,440 and No. 13,372, or either of them, until the said Respondent, Federal Home Loan Bank Board, shall determine (a) the timeliness, sufficiency, and good faith of the showings alleging bias, prejudice, interest and disqualification on the part of Respondents herein, and if such things are found affirmatively, then until the said Respondent Board shall hear and determine such charges on the merits;

(b) the timeliness, sufficiency, and good faith of the charges of disqualification of the Hearing Examiner, said Hon. Robert Hislop, and if the same are found affirmatively, until the Board shall hear and determine such charges on the merits;

5. Upon entry of this Order, the Order of this Court, filed and entered September 12, 1960, staying the proceedings before the Hearing Examiner, is vacated;

6. The Motion of Respondents to dismiss is denied.

Certificate Under 28 U.S.C. § 1292(b).

The undersigned Judge hereby certifies that he is of the opinion that the above Order involves a controlling question of law as to which there is substantial ground for difference of opinion, and that an immediate appeal from said Order will materially advance the ultimate termination of the litigation.

APPENDIX "A"

Order No. 13,372

Date: April 19, 1960

Whereas, in the opinion of the Federal Home Loan Bank Board, grounds exist for the appointment of a conservator for the Long Beach Federal Savings and Loan Association, Long Beach, California, which grounds are (1) violation of law and regulations and (2) unsafe or unsound operation in that:

(a) said Association has failed, since 1947, to pay the premium charges for insurance of the Association's accounts of insured members, in violation of Section 494(a) [404(a)] of the National Housing Act, as amended [12 U.S.C.A. § 1727(a)], and in violation of Section 563.15 of the Rules and Regulations for Insurance of Accounts;

(b) said Association has failed, since 1948, to acquire, hold and maintain its stockholdings in the Federal Home Loan Bank of San Francisco in the required amount, in violation of Section 6(l) of the Federal Home Loan Bank Act [12 U.S.C.A. § 1426(l)];

(c) said Association declared and paid dividends on savings capital during the

years 1958 and 1959 when its net income and undivided profits were insufficient to make required additions to loss reserves and to pay the said dividends;

(d) said Association, during the month of December, 1959, declared as a policy a current dividend rate of 4½% per annum commencing January 1, 1960, to be credited on share accounts as of the close of business June 30, 1960, when its undivided profits and earnings were insufficient to justify such declaration of policy or payment of such dividend;

(e) said Association has taken into income and has used for the purpose of paying expenses and dividends large amounts of proceeds of loans made for and necessary to finance to completion, the construction of houses which were specified security for the loans, the construction of many of which houses has been suspended or abandoned; and has refinanced and increased loans to seriously delinquent borrowers for the same purpose;

(f) said Association has concentrated a high percentage of its lending activity in long-term construction loans to a small number of borrowers wherein the Association is taking a disproportionate share of the risks of the speculative real estate ventures financed by said loans. The Association has failed to make available to Federal Home Loan Bank Board examiners, and has refused to comply with the requests of the Federal Home Loan Bank Board to obtain and make available to the examiners, credit reports or financial statements pertaining to said borrowers;

(g) said Association in the period August through December, 1959, made long-term construction loans aggregating approximately $6,000,000 to a corporate borrower which was then substantially delinquent in payments due on other Association loans. At the time such new loans were made, the Association knew that the record owner of all the borrower's stock had executed a trust agreement early in 1959 for the benefit of certain creditors, among whom was the Association, and that in July, 1959, all or nearly all the property of said record owner, including the stock in the borrower corporation, had been attached in a suit for approximately $2,800,000. The Association has failed to comply with the request of the examiners of the Federal Home Loan Bank Board to make available for their inspection financial statements or credit reports pertaining to said corporation or the record owner of its stock;

(h) the Association's books and records fail to reflect its true financial condition and the Board is unable to ascertain therefrom whether its assets are more or less than its obligations to its creditors and others including its members;

(i) said Association has a management which is unsafe and unfit to manage a Federal savings and loan association, in that its management has caused the Association to violate law and regulations and engage in unsafe or unsound operation;

Whereas, on the basis of the foregoing violations of law and regulations and unsafe or unsound operation, the Federal Home Loan Bank Board has determined that an emergency exists requiring immediate action for the reason that the Association's interest, and the interest of its members and of the public are in jeopardy and will be further jeopardized unless the action herein provided is immediately taken;

Now, Therefore, C. E. Ault is hereby appointed Supervisory Representative in Charge to take charge of the Long Beach Federal Savings and Loan Association, Long Beach, California, and its affairs, pending further disposition of said Association and its affairs, and, as such Supervisory Representative in Charge, to have and exercise all the powers and rights, enjoy all the privileges, and assume and perform all of the duties and responsibilities of a conservator accorded or imposed by, and subject to the provisions of, law, the Rules and Regulations for the Federal Savings and Loan System, and orders issued by the Federal Home Loan Bank Board.

I, Harry W. Caulsen, do hereby certify that I am Secretary to the Federal Home Loan Bank Board, that as such Secretary I am keeper and have charge of the files, records, and proceedings of said Federal Home Loan Bank Board, and that the foregoing is a true and correct copy of Order No. 13,372, issued by the Federal Home Loan Bank Board on April 19, 1960. (Signed April 20, 1960) by Harry W. Caulsen)

APPENDIX "B"

No. 13,440

Dated: May 12, 1960

Whereas, by Order No. 13,372, dated April 19, 1960, the Federal Home Loan Bank Board appointed a Supervisory Representative in Charge to take charge of the Long Beach Federal Savings and Loan Association, Long Beach, California, and its affairs, pending further disposition of said Association and its affairs, and

Whereas, said Supervisory Representative in Charge took charge of said Association and its affairs on April 22, 1960, and since said date has been and now is in charge thereof, and

Whereas, in the opinion of the Federal Home Loan Bank Board the following grounds exist which are cause for the appointment of a conservator for the Long Beach Federal Savings and Loan Association, Long Beach, California:

I. The Association engaged in unsafe or unsound operations.

1. Said Association declared and paid dividends on savings capital during the years 1958 and 1959 when its net income and undivided profits were insufficient to make required additions to loss reserves and to pay the said dividends.

2. Said Association, during the month of December, 1959, declared as a policy a current dividend rate of 4½% per annum commencing January 1, 1960, to be credited on share accounts as of the close of business June 30, 1960, when its undivided profits and earnings were insufficient to justify such declaration of policy or payment of such dividend.

3. Said Association has taken into income and has used for purpose of paying expenses and dividends large amounts of proceeds of loans made for, and necessary to finance to completion, the construction of houses which were specified security for the loans, the construction of many of which houses has been suspended or abandoned, and has refinanced and increased loans to seriously delinquent borrowers for the same purpose.

4. Said Association has concentrated a high percentage of its lending activity in long-term construction loans to a small number of borrowers. The Association is taking a disproportionate share of the risks of the speculative real estate ventures financed by said loans. The Association has failed to make available to Federal Home Loan Bank Board examiners, and has refused to comply with the requests of the Federal Home Loan Bank Board to obtain and make available to the examiners, credit reports or financial statements pertaining to said borrowers.

5. Said Association in the period August through December, 1959, made long-term construction loans aggregating approximately $6,000,000 to a corporate borrower which was then substantially delinquent in payments due on other Association loans. At the time such new loans were made, the Association knew that the record owner of all the borrower's stock had executed a trust agreement early in 1959 for the benefit of certain creditors, among whom was the Association, and that in July, 1959, all or nearly all the property of said record owner, including the stock in the borrower corporation, had been attached in a suit for approximately $2,800,000. The Association has failed to comply with the request of the examiners of the Federal Home Loan Bank Board to make available for their inspection financial statements or credit reports pertaining to said corporation or the record owner of its stock.

6. Said Association's books and records fail to reflect its true financial condition and the Board is unable to ascertain therefrom whether its assets are more or less than its obligations to its

creditors and others including its members.

7. The Association in September, 1957, sold its beneficial interest in 8 trusts holding over $14,000,000 in assets at an immediate loss of approximately $600,000 and a loss of future income. The Association enabled the purchaser to consummate the sale with no investment of his own by granting him an $11.7 million purchase money mortgage and releasing to him its pre-existing liens on 286 trust properties which served as collateral for loans from other institutions the proceeds of which he used as the $2 million down payment in the transaction. The Association did not have in its files any credit or financial information or other evidence of financial ability of the borrower.

8. Said Association has a management which is unsafe and unfit to manage a Federal savings and loan association, in that its management has caused the Association to violate law and regulations and engage in unsafe and unsound operation.

II. The Association has violated law and regulations.

1. Said Association has failed, since 1947, to pay to the Federal Savings and Loan Insurance Corporation the premium charges for insurance of the Association's accounts of insured members, in violation of Section 404(a) of the National Housing Act, as amended [12 U.S.C.A. § 1727], and in violation of Section 563.15 of the Rules and Regulations for Insurance of Accounts.

2. Said Association has failed, since 1948, to acquire, hold and maintain its stockholdings in the Federal Home Loan Bank of San Francisco in the required amount, in violation of Section 6(l) of the Federal Home Loan Bank Act [12 U.S.C.A. § 1426(l)].

3. Said Association has failed to build up and maintain Federal insurance reserve account as required by the Rules and Regulations for Insurance of Accounts.

4. Said Association has, through the device of trusts, speculated in real estate, in violation of Section 5 of the Home Owners' Loan Act of 1933, as amended [12 U.S.C.A. § 1464].

5. Said Association has made loans on ineligible security in violation of Section 5(c) of the Home Owners' Loan Act of 1933, as amended, and in violation of Section 545.6–1 of the Rules and Regulations for the Federal Savings and Loan System.

6. Said Association has failed to maintain a complete record of all business transacted by it, in violation of Section 545.20 of the Rules and Regulations for the Federal Savings and Loan System.

7. Said Association has failed to make annual reports of its affairs and forward copies thereof to the Federal Home Loan Bank of San Francisco, in violation of Section 545.21 of the Rules and Regulations for the Federal Savings and Loan System, Section 563.18 of the Rules and Regulations for Insurance of Accounts and Section 523.15 of the Regulations for the Federal Home Loan Bank System.

8. Said Association's officers have failed to make reports to its board of directors on forms prescribed by the Board and forward copies thereof to the Federal Home Loan Bank of San Francisco, the Federal Home Loan Bank Board and the Federal Savings and Loan Insurance Corporation, in violation of Section 545.-23 of the Rules and Regulations for the Federal Savings and Loan System and Section 563.18 of the Rules and Regulations for Insurance of Accounts.

9. Said Association has failed to transmit to the Federal Home Loan Bank Board and to the Federal Home Loan Bank of San Francisco certifications that it has either mailed to each of its members or published in newspapers annual statements of condition, in violation of Section 545.23 of the Rules and Regulations for the Federal Savings and Loan System.

Resolved, that Pursuant to and under authority of the provisions of Section 5 of the Home Owners' Loan Act of 1933, as amended (12 U.S.C. § 1464), and Section 547.6 of the Rules and Regulations

for the Federal Savings and Loan System (12 C.F.R. 545.6) (1959 Rev.), an administrative hearing will be held at 10 o'clock a. m. on the 27th day of June, 1960, in Room 535, Federal Building, 312 North Spring Street, Los Angeles, California, on whether said grounds exist for the appointment of a conservator at which hearing the Long Beach Federal Savings and Loan Association may appear and show cause why such conservator should not be appointed.

Resolved Further, That the Secretary to the Federal Home Loan Bank Board be and he hereby is instructed to send forthwith by registered mail to said Association at its last known address as it appears on the records of the Board and to each director of said Association known by the Secretary to be such at the last known address of each as the same shall appear on the records of the Board an authenticated copy of this resolution as notice to said Association.

(Certified by Harry W. Caulsen, Secretary, Federal Home Loan Bank Board.)

Appendix "C"

Statement Or Showing Of General Relevance And Reasonable Scope Of The Evidence Sought.

Respondent Association respectfully states and shows that the evidence sought by such subpoenas and subpoenas duces tecum and the testimony of said witnesses and each of them, and proof from said documents and each of them would be to prove and show:

a. That Chairman Albert J. Robertson, and Member Ira Dixon, and Member William Hallahan and each of them are individually and collectively and personally biased, prejudiced, interested, and disqualified to sit or act as judges, board members, hearing officers, or otherwise to consider, hear or decide the merits of the issues of fact and law presented by the allegations and charges of said order number 13,372 wherein said C. E. Ault was appointed EX PARTE as Supervisory Representative in Charge of said Association and Order Number 13,-440 wherein said Board is to decide whether or not it will appoint a conservator for or otherwise dispose of the business and assets of said Association.

Said evidence will show that said Board members, the Federal Savings and Loan Insurance Corporation of which they are the sole governing authority, and various of their subordinates are personal defendants in bitterly contested litigation involving over 20 millions of dollars. Said Association and its Shareholders' Protective Committee are plaintiffs in said litigation asking judgments, accounting, return of seized and misappropriated assets and property against said Board, Insurance Corporation and their subordinates. Bitter personal animosity, bias and prejudice has arisen in said Board against said Association and its officers. Said evidence will also show that said Board and its subordinates have pre-judged and finally decided said conservator hearing and Board has entered upon a program for the final liquidation and complete destruction of respondent Association before said conservator hearing has been completed. Said evidence will also show that said Board is personally biased and prejudiced against T. A. Gregory, President of said Association, and will not give him or said Association any evidence it or he may produce, any consideration, weight, or credibility. Said evidence will also show that said Board as part of its plan to liquidate and destroy said Association has deliberately provoked a run of withdrawals by terrified and intimidated depositors of respondent Association. Said run has already liquidated approximately $40,000,000.00 of said Association's total of approximately $96,000,000.00 of savings deposits. Said Association's savings depositors totaled (before said run) approximately 90,000 in number.

b. That no justification or grounds whatsoever existed for the ex parte or other seizure of said Association or for the appointment of a conservator for it or for any disposition of its business. Respondent Association urgently needs the testimony and evidence herein sought

to enable and assist it in the filing in good faith of a further, more detailed, timely and sufficient affidavits of personal bias and disqualification, against said Board Chairman and Members and each of them.

#### APPENDIX "D"

For A Second, Further And Affirmative Defense, Association Alleges:

That its seizure, liquidation which is already under way, and threatened confiscation and dissolution, are part of a scheme, plan and design for the deliberate ruin and final dissolution and liquidation and utter destruction of respondent Association.

No reason or justification whatsoever exists or existed for any conservator or supervisory representative to take charge of the Association.

Said plan, scheme and design are motivated by said Bank Board and its subordinates from malice, fraud, bad faith, hatred and animosity. Said Bank Board and its subordinates, including its agent A. V. Ammann and said Insurance Corporation, are all defendants and cross-defendants in litigation pending in the United States Courts and in the California State Courts since 1946. Said defendants have been required, but have failed and refused to account for over $26,000,000 of Association's United States bearer bonds, cash, negotiable notes, deeds of trust, bank stock, and other assets. Said $26,000,000 was seized without notice, all receipts were refused, uncounted cash of several hundred thousand dollars was taken. Independent auditors, certified public accountants employed by said Association, were present, but were refused by said Board's predecessors and their subordinates any opportunity to account, audit, or check any part of said Association's $26,000,000 of negotiable assets so seized.

The second ex parte seizure of respondent Association took place April 22, 1960. With minor exceptions, the same Bank Board subordinates, attorneys and other personnel planned and executed the second seizure. With minor exceptions, all receipts were refused. The second seizure paralleled the first seizure.

In both the first and second seizures said Bank Board, said Insurance Corporation and their agents and subordinates deliberately provoked a run of said Association's intimidated and terrified shareholder-depositors. The run in 1946 exceeded $10,000,000. Another run of withdrawals was deliberately provoked in April-June, 1960. Said run was deliberately caused and intentionally provoked, and planned and prepared for months in advance of said seizure by said Bank Board, Insurance Corporation, and their subordinates and agents. Upon information and belief, said run has thus far amounted to about $60,000,000 of said depositors' savings.

Upon information and belief, said run will be further incited, provoked and aggravated, by said Bank Board et al. with the ultimate purpose of complete liquidation and destruction of respondent Association. Among the purposes of said second seizure was an attempt by said Bank Board to obtain control of both sides of said litigation and thereby escape and prevent any trial on the merits.

For A Third, Further And Affirmative Defense, Association Alleges:

Said second ex parte seizure of Association by said Bank Board was also made to prevent conversion of Association from a Federal Savings and Loan Association to a California State Mutual Savings and Loan Association.

By Acts of Congress Title 12 U.S.C. § 1464 and other U. S. law, no approval or authorization from said Bank Board was required for Association to so convert.

California State Savings and Loan Examiners from California Savings and Loan Commissioners office entered Association on April 11, 1960 to examine it for approval of such conversion. Eight days later on April 19, 1960 said Bank Board adopted said Order No. 13,372 for ex parte seizure of Association. Association was so seized on April 22, 1960.

Had such conversion taken place Association and its shareholders could have

litigated against said Bank Board et al. without threat of ex parte seizure and liquidation.

By such unauthorized and illegal seizure said Bank Board obtained the power to prevent such conversion, unless said Board consents to such conversion. This power had been denied to said Board and its predecessor by the Congress of the United States.

For A Fourth, Further And Affirmative Defense, Association Alleges:

That said Bank Board members and/or their supervisory staff and/or various members thereof, were interfered with and dictated to, directed or controlled in their actions in said ex parte seizure and thereafter. Thereby the functions, authorities and powers conferred only upon said Bank Board members, by the Congress of the United States were usurped, trespassed upon and nullified by said usurpers and intruders. That among said usurpers and intruders so interfering with said Bank Board members' discharge of their duties imposed by Congress, were various of the staff and/or administrative officers of the President and/or the Vice-President of the United States.

That such interference with and influencing of said Bank Board members and each of them, was in violation of, and contrary to the laws and the Constitution of the United States. That such has resulted in, and will result in, decisions, actions, orders and refusals by said Bank Board members and each and all of them, preventing and obstructing respondent Association and its shareholders receiving their constitutional and statutory rights to a fair trial and to a decision of the fate of their deposited savings by an unbiased, disinterested and impartial Bank Board of three members as required by the laws of the United States.

That each of said Bank Board members and chairman are personally biased, prejudiced, interested and are motivated by animosity, malice and hatred against respondent Association and its shareholders, and said Bank Board chairman and each of said Bank Board members are thereby disqualified and prevented from hearing, considering or deciding any of the evidence, issues or merits of said respondent Association or its shareholder rights or defenses.

APPENDIX "E"

Affidavit

District of Columbia } ss

It has come to the attention of the undersigned members of the Federal Home Loan Bank Board that assertions are being made, both publicly and in the course of legal proceedings, by persons acting or purporting to act for the former management and for the shareholder members of the Long Beach Federal Savings and Loan Association, that the Federal Home Loan Bank Board, and each of the members thereof personally, are biased and prejudiced against said Association and its former president and management, and that, in consequence, the Board's appointment of a trial examiner to hear and render a recommended decision on the Board's charges of improper conduct of the Association is of no force, validity, or effect, and that the Board and its members individually are disqualified to adjudicate such charges solely upon the basis of the entire record of hearing made before said trial examiner, including his recommended decision.

The undersigned, speaking as the Federal Home Loan Bank Board, of which they constitute the entire present membership, and also each for himself personally, on oath states that neither the Board as such, nor any of them personally, are biased or prejudiced as alleged, and they further swear that the minds of the Board and of each of the undersigned personally are in no degree closed, nor have they prejudged, nor will they prejudge the issues submitted to the trial examiner, and that as a Board and individually they will make their decision solely upon the basis of the entire record of hearing made before said trial examiner, including his recommended decision, free from bias or prejudice and

solely in discharge of their statutory duties and responsibilities in the matter.

S/ Albert J. Robertson

Albert J. Robertson, Chairman

S/ Ira Dixon

Ira Dixon, Member

Members of the Board and Personally

Personally appeared the foregoing Albert J. Robertson, Chairman of the Federal Home Loan Bank Board, and Ira Dixon, Member of the Federal Home Loan Bank Board, and subscribed the foregoing affidavit and severally made oath that the statements therein are true, before me in the District of Columbia, this 9th day of September, 1960.

S/ Charles M. Dulin

Notary Public

My commission expires Nov. 1, 1962. (Seal)